# United States Court of Appeals

## For the First Circuit

No. 02-1763

FRESENIUS MEDICAL CARE CARDIOVASCULAR RESOURCES, INC.,

Plaintiff, Appellee,

v.

PUERTO RICO AND THE CARIBBEAN CARDIOVASCULAR CENTER CORP.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch, Circuit Judge, and

Coffin and Campbell, Senior Circuit Judges.

Manuel R. Suarez Jiménez for appellant.

Robert P. Mallory, with whom Jennifer J. Waldner, McDermott, Will & Emery, Néstor M. Méndez Gómez, Oreste R. Ramos, and Pietrantoni Méndez & Alvarez LLP were on brief for appellee.

March 6, 2003

**LYNCH**, **Circuit Judge**. This case raises the issue of whether the defendant public corporation is an arm of the Commonwealth of Puerto Rico and so entitled to assert immunity under the Eleventh Amendment. It causes us to reshape this circuit's arm-of-the-state test in light of intervening Supreme Court precedent.

Our analysis under the reshaped test leads us to affirm the district court's conclusion that the defendant, Puerto Rico and the Carribean Cardiovascular Center Corp. (PRCCCC), is not an arm of the Commonwealth and so is not entitled to immunity. We also uphold the district court's finding that PRCCCC was adequately served with process. The underlying lawsuit involves a claim by Fresenius Medical Care Cardiovascular Resources, Inc. (FMC) against PRCCCC for breach of contract, the details of which are not germane to the issues on appeal.

I.

On September 28, 2001, FMC filed a federal court complaint against PRCCCC, asserting diversity jurisdiction under 28 U.S.C. § 1332(a)(1), (d) (2000). It sought over $7,000,000 in damages for breach of contract and of the implied covenant of good faith and fair dealing. It also sought an order requiring specific performance of the contract by PRCCCC and a declaratory judgment that FMC was not in material breach of the agreement.

PRCCCC moved to dismiss the complaint on November 13, 2001. It moved to dismiss on the grounds that PRCCCC is an arm of the state entitled to Eleventh Amendment immunity; that PRCCCC is not a citizen of Puerto Rico for diversity purposes since it is an arm of the state; that FMC lacked standing; and that there was defective service of process. PRCCCC attached to its motion an unauthenticated chart listing the hospital's total revenues and legislative appropriations as well as a statement under penalty of perjury by José Soler Zapata, Acting Medical Director of PRCCCC and former Secretary of Health of the Commonwealth of Puerto Rico. FMC, in its opposition, submitted a statement under penalty of perjury by Bill Watson, its executive responsible for dealing with PRCCCC, and objected to the Zapata statement on evidentiary grounds. After receiving two extensions, PRCCCC eventually filed an untimely reply.

The district court denied PRCCCC's motion in an opinion and order dated March 18, 2002. The court applied the multi-factor arm-of-the-state test set forth in Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Authority, 991 F.2d 935, 939-40 (1st Cir. 1993). Noting that the most important factor is the entity's relationship to the public fisc, the district court held that this factor weighed against a finding of immunity because the Commonwealth would not be obligated to pay a judgment against PRCCCC and because PRCCCC receives a relatively small share of its

-3-

funds from the Commonwealth. It also rejected PRCCCC's argument of inadequate service of process.

PRCCCC filed two motions for reconsideration of the district court's March 18 decision. PRCCCC produced new evidence in support of its second motion for reconsideration: statements by Luisa Rivera Lúgaro, the former Executive Director of PRCCCC, and Miguel Bustelo, the Chief Financial Officer of PRCCCC. Bustelo's affidavit attached a new income statement identifying sources of government funding apart from legislative appropriations. Plaintiff again objected to consideration of the evidence. The district court, without providing plaintiff the opportunity to produce more evidence, considered this late-filed information but denied the motion in a six page opinion and order dated May 7, 2002.[1]

On May 21, 2002, PRCCCC filed an interlocutory appeal. See P.R. Acqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147 (1993) (entities claiming to be arms of the state may immediately appeal a district court order denying a claim of Eleventh Amendment immunity under the collateral order doctrine). It also filed a motion in the district court to stay proceedings while its appeal was pending. The district court denied the stay

---

[1] In its opinion and order denying the second motion for reconsideration, the district court also correctly found that FMC did not, as defendant charges, provide misleading adjusted budget percentages about PRCCCC's operations.

-4-

request on June 4, 2002 and denied a motion for reconsideration of that order on July 1, 2002.[2]

PRCCCC finally sought a stay from this court on October 15, 2002, more than four months after the district court denied its stay request. On November 6, 2002, this court denied the request.[3]

---

[2] At the same time, PRCCCC failed to meet its obligations to move forward either its appeal or the trial court proceedings. In its appeal of the district court's March 18 and May 7 rulings, PRCCCC missed the deadlines to file counsel's appearance form, its docketing statement, and its brief, after those deadlines were extended. In the district court, it disregarded a September 23, 2002 court order requiring PRCCCC to comply with discovery requests that had been pending for over six months.

In its appeal of the district court's Eleventh Amendment finding, PRCCCC again failed to meet its obligations when it submitted its reply brief to this court. The reply brief was late and longer than our rules permit. In addition, the reply brief repeatedly made new and unsupported factual allegations. See Fed. R. App. P. 28(a)(7). Plaintiff opposed the filing of the reply brief on the grounds that it was untimely, oversized, and made irrelevant factual accusations. We strike the statement of facts and new factual references in the reply brief but have considered the legal arguments made.

[3] This court's order denying the stay said:

A request for a stay essentially invokes the equitable powers of this court. Here, the conduct of [PRCCCC] evidences a pattern of causing delay in this litigation, both in this court and the district court, including missing filing deadlines after those deadlines were extended. Accordingly, we think the Hospital is in a poor position to claim that it will suffer injury if the stay is not granted. We therefore deny the motion for a stay.

We will, however, expedite this appeal. . . . Should the trial date in the district court arrive before this court has decided the appeal, then the Hospital may reapply for a stay.

A month later, PRCCCC filed an "urgent motion for reconsideration" of this court's denial of the stay request, claiming that the trial date had in fact arrived before this court

-5-

II.

A.  Standards for Arm-of-the-State Analysis

We review de novo the conclusion that PRCCCC is not entitled to Eleventh Amendment immunity.  Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 22 (1st Cir. 2001).

The question of whether PRCCCC is an arm of the Commonwealth and entitled to share its Eleventh Amendment immunity is a question of federal law.  Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 n.5 (1997).  The Commonwealth of Puerto Rico is treated as a state for Eleventh Amendment purposes.  P.R. Ports Auth. v. M/V Manhattan Prince, 897 F.2d 1, 9 (1st Cir. 1990).  Here the Commonwealth itself is not a party nor has it sought to express its views in this litigation as a party or amicus; PRCCCC is the party and is attempting to cloak itself in the Commonwealth's Eleventh Amendment immunity under the theory that it is an arm of the state.  PRCCCC, the entity asserting Eleventh Amendment immunity, bears the burden of showing it is an arm of the state.

---

had decided the appeal.  PRCCCC's claim was false.  PRCCCC suggested that the parties would engage in arbitration at the district court's behest, before the appeal was decided, and that this was the equivalent of a trial date.  In fact, no steps had been taken by either side to initiate arbitration.  No date for arbitration had been set, and an arbitrator had not been contacted. Because nothing had changed since the issuance of the November 6 order, this court denied the motion for reconsideration on December 19, 2002.

-6-

Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 99 (1st Cir. 2002).

The arm-of-the-state doctrine arises in connection with at least three types of entities.[4] The first is a political subdivision of the state, such as a city or county. Political subdivisions are not entitled to Eleventh Amendment immunity. See, e.g., Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 369 (2001) (citing Lincoln County v. Luning, 133 U.S. 529, 530-31 (1890)); see also Moor v. County of Alameda, 411 U.S. 693, 717-721 (1973) (political subdivision not arm of the state for diversity jurisdiction purposes). The second entity is established by two (or more) states by compact and approved by Congress. The third, the type at issue here, involves a special-purpose public corporation established at the behest of a state. Multi-state compact entities and special-purpose public corporations established by a state sometimes share the state's Eleventh Amendment immunity. The arm of the state analytical doctrine has moved freely amongst these three categories, applying common principles.

_____

[4] PRCCCC does not argue that it is simply acting as an agent of the state, such as a private corporation acting under contract as a fiscal intermediary for a health insurance program for state employees. See Shards Teaching Hosp. & Clinics, Inc. v. Beech St. Corp., 208 F.3d 1308 (11th Cir. 2000). Nor would the record support any such argument.

-7-

The Supreme Court's modern arm-of-the-state jurisprudence starts with Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977), which rejected the school board's claim that it was an arm of the state and not a political subdivision. In Mt. Healthy, the Supreme Court looked in part to state law to consider the "nature of the entity created by law." Id. at 280. It concluded that state law rendered the board more like a county or city, and thus not an arm of the state. The court considered a balance of factors: The board obtained guidance and extensive monies from the state, but that was offset by the board's revenue-raising power, including its power to issue bonds and levy taxes. Id. It was unclear whether "the Court was using state law as an indication of the state's intention with respect to school bonds or as a structural feature that the Court would look to regardless of the state's intention." Morris v. Wash. Metro. Area Transit Auth., 781 F.2d 218, 223 (D.C. Cir. 1986). This court, as discussed below, has chosen to ask the question in terms of how the state structured its relationship to the entity.

The Mt. Healthy decision was followed by Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391 (1979), which, by contrast, involved a bi-state agency, and thus raised different concerns, including the interests of the federal government under the Compact Clause. There the court held:

-8-

> [S]ome agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.

Id. at 400-01. Lake Country also considered several facts as pertinent to the analysis.[5]

That was the state of the doctrine in 1993, when this court decided Metcalf & Eddy, 991 F.2d at 939-40. For the past decade the courts of this circuit, under Metcalf & Eddy, have assessed an entity's arm-of-the-state status by focusing on whether

---

[5] The Court in Lake Country identified the following facts as germane to the arm-of-the-state status of the Tahoe Regional Planning Agency (TRPA):

> 1. the designation in the interstate compact of the TRPA as a "separate legal entity" and a "political subdivision";
> 2. the power that resided in counties to appoint six of the ten governing members of the TRPA whereas the states appointed only four members;
> 3. the funding of the TRPA exclusively by the counties;
> 4. the express pronouncement in the compact that obligations of the TRPA were not binding on either state;
> 5. the function of the TRPA, which was to regulate land use; and
> 6. the failure of the states to preserve veto power over rules promulgated by the TRPA.

See 440 U.S. at 401-02. Thus, the analysis considered (a) how the entity is characterized under state law; (b) the level of control exercised by the state; (c) the entity's relationship to the public treasury (both the relative size of its government appropriation and whether the government is legally liable for the entity's debts); and (d) whether the entity performs a state function. See generally A.E. Rogers, Note, Clothing State Governmental Entities With Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine, 92 Colum. L. Rev. 1243 (1992) (criticizing the Court's continuing use of a multi-factor approach).

-9-

the structure established by the state reveals that the agency is an arm of the state; if the structure does not resolve the question, then the primary focus is on whether the action is in essence one for recovery from the state. Because answers are not always clear, we have encouraged the use of a non-exclusive list of factors, and identified at least seven areas of inquiry.[6] These multi-factor tests, as we noted in Neo Gen Screening, Inc. v. New England Newborn Screening Program, 187 F.3d 24, 27 (1st Cir. 1999), "are not easy to apply." Still, Metcalf & Eddy presciently predicted the ways in which the Supreme Court would view the issue.

In the intervening decade since Metcalf & Eddy there have been two Supreme Court decisions addressing arm-of-the-state issues: Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 33 (1994), involving a bi-state entity, which updated and clarified

---

[6] "These areas, each of which can be mined for information that might clarify the institution's structure and function, include:
> (1) whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees;
> (2) whether the agency's function is governmental or proprietary;
> (3) whether the agency is separately incorporated;
> (4) whether the state exerts control over the agency, and if so, to what extent;
> (5) whether the agency has the power to sue, be sued, and enter contracts in its own name and right;
> (6) whether the agency's property is subject to state taxation; and
> (7) whether the state has immunized itself from responsibility for the agency's acts or omissions."

Id. at 939-940.

the arm-of-the-state doctrine; and Auer v. Robbins, 519 U.S. 452, 456 n.1 (1997), which briefly applied Hess to an intra-state entity. Additionally, in that time, a number of important Supreme Court decisions have reshaped Eleventh Amendment doctrine. The question is raised then as to whether those opinions cause us to reshape the Metcalf & Eddy test.

We start with the larger Eleventh Amendment doctrine. Several points, at least, are informative to our analysis. The first is that the Supreme Court has said that it is not just the state's interest in its public treasury which is at stake in the assertion of Eleventh Amendment immunity. The state also has a "dignity" interest as a sovereign in not being haled into federal court. Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 122 S. Ct. 1864, 1874-75 (2002). These twin goals of the Eleventh Amendment -- protection of the state's treasury and of its dignitary interests -- explicitly govern the arm-of-the-state analysis. Hess, 513 U.S. at 39-41.

The changes in Eleventh Amendment doctrine have created different consequences for a finding that an entity partakes of Eleventh Amendment immunity as an arm of the state. The Eleventh Amendment has always acted to restrict the jurisdiction of the federal courts to entertain claims against the state when the underlying source of federal jurisdiction is diversity jurisdiction. See Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d

-11-

1200, 1202-03 (1st Cir. 1993). The Amendment also restricts the jurisdiction of the federal courts to hear private claims based on federal causes of action created by the Congress, see Edelman v. Jordan, 415 U.S. 651, 662-64 (1974), subject to the Ex Parte Young exception for injunctions against state officers, Ex Parte Young, 209 U.S. 123, 159 (1908). Importantly, the Court has recently held that the Amendment's inherent notions of state sovereign immunity impose restrictions on the power of Congress, acting under certain Article I powers, to create privately enforced federal causes of action against the states. Seminole Tribe v. Florida, 517 U.S. 44 (1996). Where the Eleventh Amendment bars jurisdiction over a claim in federal court, the states may decline on sovereign immunity grounds to entertain such an action. Alden v. Maine, 527 U.S. 706, 731-32 (1999).

While this case is a diversity action for breach of contract, the criteria for rules about what is an arm of the state have not varied with whether the basis for federal jurisdiction is diversity or federal question. Accordingly, any arm-of-the-state conclusion here has implications for the enforceability of federal laws enacted under Article I in suits by private persons against PRCCCC.

Thus, where an entity claims to share a state's sovereignty and the state has not clearly demarcated the entity as

sharing its sovereignty, there is great reason for caution. It would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty. The consequences of an arm-of-the-state finding are considerable. For example, where a state consents to suit in its own courts, such an arm-of-the-state finding may pose a threat to the state treasury, even if the state has not structured the entity so as to put its treasury at risk. In an era when many states face budget crises and impose cutbacks on recognized state agencies, yet another claimant on the treasury may not be welcomed.

Not all entities created by states are meant to share state sovereignty. Some entities may be part of an effort at privatization, representing an assessment by the state that the private sector may perform a function better than the state. Cf. Richardson v. McKnight, 521 U.S. 399, 405-07 (1997) (discussing advantages of private sector entities performing government functions and role of private contractors in prison administration). Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate. Such enterprises may need incentives to encourage others to contract with them, such as the incentives of application of usual legal standards between private contracting parties. The

dollar cap on recovery found in many state sovereign immunity statutes would be a powerful disincentive to a private party to contract with an entity, unless the private party first obtained a waiver of immunity from the entity.  See generally Defendini Collazo v. Commonwealth of P.R., 134 D.P.R. 28 (1993), available at 1993 WL 839857 (discussing limited waivers of sovereign immunity under Puerto Rico law).  In Puerto Rico, a breach of contract action against the Commonwealth is capped at $75,000.  32 P.R. Laws Ann. § 3077(c) (2001).

A conclusion that the entity is beyond the control of privately enforced Article I legislation enacted by the Congress may also be undesirable to a state.  A state may not have intended, for example, that the employees of the entity be unable to privately enforce the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2000), see Alden, 527 U.S. at 712 (dismissing FLSA lawsuit by state employees on grounds that Congress, acting pursuant to its Article I powers, could not abrogate the sovereign immunity of states in state court); or Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111-12117 (2000), see Garrett, 531 U.S. at 360 (holding that suits by state employees to recover money damages for a state's failure to comply with the provisions of Title I of the ADA are barred by the Eleventh Amendment); or the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, see Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 82-83 (2000) (holding

-14-

that ADEA's purported abrogation of the states' sovereign immunity is invalid because ADEA is not "appropriate legislation" under section five of the Fourteenth Amendment); or provisions of the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654, see Laro v. New Hampshire, 259 F.3d 1, 4 (1st Cir. 2001) (invalidating on Eleventh Amendment grounds a private cause of action for money damages against the state under the personal medical leave provision of the FMLA). A state could adjudge that those effects may be unwanted disincentives to people who might otherwise seek employment with the entity, or that it is unwise to differentiate the entity's employees from those in the private sector. In sum, states set up entities for many reasons. An erroneous arm-of-the-state decision may frustrate, not advance, a state's dignity and its interests.

Against that context of the serious consequences on both sides of this issue, it is the developments in the arm-of-the-state case law from the Supreme Court which bind us here. The most recent full discussion of the doctrine is in Hess. Hess, like Lake Country before it, involves an entity created by two states under the Compact Clause of the Constitution. A closely divided court in Hess held that the Port Authority Trans-Hudson Corporation was not an arm of the state. As noted above, the Hess analysis explicitly recognizes the Eleventh Amendment's twin interests: protection of the fisc and the dignity of the states. 513 U.S. at 39-40, 47.

As to bi-state Compact Clause entities, the <u>Hess</u> court continued the general approach taken in <u>Lake Country</u>:

> We would presume the Compact Clause agency does not qualify for Eleventh Amendment immunity "unless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the states themselves and that Congress concurred in that purpose."

Id. at 43-44 (quoting <u>Lake Country</u>, 440 U.S. at 401). Putting aside the question of presumption, <u>Hess</u> requires a two-step analysis. <u>Accord</u> <u>Harter</u> v. <u>Vernon</u>, 101 F.3d 334, 337 (4th Cir. 1996). The first step of the analysis concerns how the state has structured the entity. This step, we think, pays deference to the state's dignitary interest in extending or withholding Eleventh Amendment immunity from an entity. After all, a state may easily make clear by statute its view that an entity is to share the state's immunity. Where the state has not made a clear statement, its dignity interests are nonetheless protected by an examination of the structure the state has chosen to establish. In evaluating whether the state had structured an agency to be an arm of the state, <u>Hess</u> looked at "various indicators of immunity or the absence thereof."[7] 513 U.S. at 44.

---

[7] Among the indicators <u>Hess</u> considered were:
1. extent of state control including through the appointment of board members and the state's power to veto board actions or enlarge the entity's responsibilities;
2. how the enabling and implementing legislation characterized the entity and how the state courts have viewed the entity;
3. whether the entity's functions are readily classifiable as state functions or local or non-governmental functions; and

If the structural indicators point in different directions, then the second stage of analysis comes into play. At this stage, the vulnerability of the state's purse is the most salient factor in the Eleventh Amendment determination.[8] Where it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity. See id. at 47-49.[9]

---

   4. whether the state bore legal liability for the entity's debts. See 513 U.S. at 44-46.

[8] This Hess vulnerability inquiry includes examination of these, among other, factors: whether the state laws impose an obligation on the state to be responsible for payment of judgments against the entity (on this point federal courts are not free to assume that a state will voluntarily assume the payment of the entity's debts if the entity is in need); other sources of revenue for the entity; and whether the agency is so structured that, as a practical matter, the state anticipated budget shortfalls that would render the entity constantly dependent on the state. Id. at 49-50.

[9] Although the dissent in Hess would reach a different conclusion on the facts there, it agrees that the key initial question is whether "the State has structured the entity in the expectation that immunity will inhere." Id. at 58 (O'Connor, J., dissenting). The dissent also agrees that if the entity's liabilities are funded by the taxpayers' dollars, then there is Eleventh Amendment immunity. Id. at 60-61. The Hess dissent did not agree that the converse was true: that if the state treasury was not directly implicated, then there would be no immunity. The dissent would then ask whether the state "possesses sufficient control over an entity performing governmental functions that the entity may properly be called an extension of the State itself." Id. at 61. If "the lines of oversight are clear and substantial -- for example, if the state appoints and removes an entity's governing personnel and retains veto or approval power over an entity's undertakings" -- then, on the dissent's reasoning, the entity should be deemed an arm of the state for Eleventh Amendment purposes. Id.

In the aftermath of Hess, the circuits almost uniformly find that, when there is an ambiguity about the direction in which the structural analysis points, the potential payment from the state treasury is the most critical factor in determining whether an entity is operating as an arm of the state. See 17A J.W. Moore et al., Moore's Federal Practice § 123.23(4)(b), at 123-60 & n.51 (3d ed. 2000) [hereinafter Moore's] (collecting cases).

The question for the lower federal courts becomes what parts of Hess govern the analysis of an intra-state entity such as PRCCCC. Compact Clause entities by their nature involve different federalism concerns than intra-state entities. Several objections might be made to applying Hess here. The presumption announced in Hess may be limited to multi-state entities. It might also be thought that the two-step Hess analysis applies only to multi-state Compact Clause entities, and so not to a public corporation formed by the Commonwealth alone. Or it might be thought, more generally, that Hess is inconsistent with later Eleventh Amendment case law, and so should not be taken as establishing doctrine controlling now.

Hess itself noted there was reason to treat Compact Clause entities somewhat differently. 513 U.S. at 42 ("There is good reason not to amalgamate Compact Clause entities with agencies of one of the United States for Eleventh Amendment purposes.") (internal quotation omitted); accord Hadley v. N. Ark. Cmty.

-18-

Technical Coll., 76 F.3d 1437, 1439 (8th Cir. 1996) (interpreting Hess). "As part of the federal plan prescribed by the Constitution, the States agreed to the power sharing, coordination, and unified action that typify Compact Clause creations. . . . [T]he federal tribunal cannot be regarded as alien in this cooperative, tri-governmental arrangement." Hess, 513 U.S. at 41-42. Here, by contrast, the federal government is not a party to the arrangement. As a result, we think the presumption announced in Hess -- a presumption against an entity being an arm of the state -- applies only to Compact Clause entities, and the logic of it does not extend to the two other categories of cases.

We conclude, however, that the two-step analysis of Hess is not limited to Compact Clause entities. Several reasons support this conclusion. First, Hess is founded on the twin reasons underlying the Eleventh Amendment, reasons common to all categories of cases. Further, the Hess court cited Metcalf & Eddy, which did not involve a multi-state Compact Clause entity, among cases supporting the point that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." Hess, 513 U.S. at 48. Hess also cited cases from four other circuits adhering to that principle when the entities involved included intra-state authorities, as well as political subdivisions and bi-state entities. Id. at 48-49. There is no indication the court intended to differentiate in the application of its major

-19-

tests depending on the nature of the entity.  Thus, Metcalf & Eddy foreshadowed Hess's determination that when there is ambiguity from the structure about whether an entity is an arm of the state, the primary focus is on the risk to the state treasury.

Next, the circuits have also viewed Hess as applying to political subdivision and intra-state corporation cases.  Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289, 293 (2d Cir. 1996) ("Although Hess involved a bi-state entity, we nevertheless believe that it is the proper starting place for our Eleventh Amendment inquiry in this case," involving an intra-state entity); see, e.g., Harter, 101 F.3d at 337-40 (applying Hess to determine whether an entity should be characterized as a political subdivision or a state agency).

Finally, Auer v. Robbins, a case involving an intra-state entity, the Board of Police Commissioners, supports our reading that the two-step analysis applies beyond Compact Clause entities. In a footnote, the Court held the Board was not an arm of the state because the state was not responsible for the Board's financial liabilities and the only form of state control was the governor's power to appoint four of five Board members.  519 U.S. at 456 n.1. The Court did not cite to its earlier precedent, such as Mt.

Healthy, but rather to its bi-state compact cases, Hess and Lake Country.[10]

As to the more general concern, some have questioned Hess's viability in light of Seminole and its aftermath. See Thiel v. State Bar, 94 F.3d 399, 401-03 (7th Cir. 1996) (viewing Hess as implicitly limited by Seminole). Hess's emphasis on protection of the state fisc as a primary component of an arm-of-the-state analysis has been criticized as not entirely consistent with the broader Eleventh Amendment interests established by other and later cases. See C.M. Vazquez, What Is Eleventh Amendment Immunity?, 106 Yale L.J. 1683, 1731-32 (1997); see also Thiel, 94 F.3d at 401-02.

One response would be that Hess was concerned with an entirely different problem. Seminole and its progeny are addressed to what protection is given the state by the Eleventh Amendment. Hess is concerned with who is entitled to share that protection. When the state has not made it clear through structure that an entity is to share its immunity, there is reason not to reach a

---

[10] In Regents of the University of California v. Doe, the Court said generally:

> Of course, the question of whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity being sued.

519 U.S. at 430.

-21-

result inconsistent with what the state has apparently hoped to effectuate (that is, an independent entity) unless there is a risk to the state fisc.

Another response would be that Seminole and its progeny affirm the longstanding view, operationalized in Hess, that the Eleventh Amendment exists to protect the fiscal and dignity interests of the state. Seminole, 517 U.S. at 58. The first prong of Hess pays considerable deference to the dignity interests of the state, focusing on both explicit and implicit indications that the state sought to cloak an entity in its Eleventh Amendment immunity.

Finally, even were the criticism to have force, Hess binds us and has not been overruled. To the contrary, it has been consistently cited by the Court.[11] We must follow it until the Supreme Court decides otherwise. State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989).

Accordingly, in the aftermath of Hess, Auer and Regents of the University of California, we think the Hess analysis governs and has refined the Metcalf & Eddy analysis, which is consistent

---

[11] E.g., Solid Waste Agency v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 174 (2001); Alden, 527 U.S. at 746; Seminole, 517 U.S. at 58.

with <u>Hess</u>.  We view <u>Hess</u> as involving two key questions, with many factors instructive on each:

1.  Has the state clearly structured the entity to share its sovereignty?  This evaluation is undertaken[12] in light of the different factors described in <u>Hess</u>, <u>Lake Country</u> and <u>Metcalf & Eddy</u>.

2.  If the factors assessed in analyzing the structure point in different directions, then the dispositive question concerns the risk that the damages will be paid from the public treasury.  This is the rule of <u>Metcalf & Eddy</u>, valid today as well.

---

[12] Lest our focus on the structure created by the state be misunderstood, whether an entity is entitled to partake of a state's Eleventh Amendment immunity is a question of federal law, not state law:

> Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore "one of the United States" within the meaning of the Eleventh Amendment, is a question of federal law.  But that federal question can be answered only after considering the provisions of state law that define the agency's character.

<u>Regents of the Univ. of Cal.</u>, 519 U.S. at 429 n.5.  The Supreme Court has adverted to state law, but has not defined what role it is to play.  <u>See, e.g.</u>, <u>Mt. Healthy</u>, 429 U.S. at 280.  In <u>Hess</u> itself the majority declined to adopt the state court's characterization of the agency.  <u>See</u> 513 U.S. at 45 (holding that the Port Authority does not enjoy Eleventh Amendment immunity despite the fact that "[s]tate courts . . . repeatedly have typed the Port Authority an agency of the States rather than a municipal unit or local district").

-23-

This analysis focuses on whether the state has legally or practically obligated itself to pay the entity's indebtedness.

The control asserted by the state is an important guide to the initial inquiry. But where the evidence is that the state did not structure the entity to put the state treasury at risk of paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state.

## B. Application of Standards

We now apply these standards to the facts of this case. There are no factual findings of disputed facts by the district court, as the issue was decided under Rules 56 and 12(b)(6).[13] PRCCCC does not claim that there were disputed facts requiring resolution by the trial court. The parties do draw different conclusions from the undisputed financial records of PRCCCC. We consider the facts from admissible evidence that are germane to Eleventh Amendment immunity in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Wojcik, 300 F.3d at 96.

---

[13] We treat the Fed. R. Civ. P. 12(b)(6) motion raising PRCCCC's Eleventh Amendment defense as a motion for summary judgment, since both parties presented and the court did not exclude evidence outside the pleadings. Fed. R. Civ. P. 12(b).

1.  Structuring of PRCCCC

a.  The Enabling Act

The enabling act that created PRCCCC, 24 P.R. Laws Ann. §§ 343-343k (2000), does not by its terms structure PRCCCC to be an arm of the state.  In fact, it suggests exactly the opposite.  The act creates an "entity which is independent and separate from any other agency or instrumentality of the Government of the Commonwealth of Puerto Rico."  Id. § 343a.  Moreover, PRCCCC is explicitly empowered to enter into contracts with the state, specifically the Commonwealth's Department of Health, the University of Puerto Rico, and "any other bodies or instrumentalities of the Commonwealth of Puerto Rico."[14]  Id. § 434b(n).  Further, the act provides that PRCCCC may "borrow" money from the Commonwealth, id. § 343b(g), and that the Commonwealth will charge it rent for use of its building, which "shall help to amortize the debt for a period of thirty (30) years," id. § 343g.  The Board is authorized to create a budget, which it must submit to the legislature, but the budget is required to stay "within the limits of [PRCCCC's] estimated income so as to keep from incurring

_____

[14] In PRCCCC's favor is that it has been exempted from all taxes and fees collected by the government of Puerto Rico and its political subdivisions.  Id. § 343e.  By like token, that very language indicates it is not a political subdivision.  In reference to PRCCCC's tax exempt status, FMC executive Watson observes that many of the private hospitals he has dealt with are also exempt from local taxes and duties.

-25-

shortfalls."  Id. § 343h.  Importantly, the act does not say the treasury of the Commonwealth will pay for those shortfalls.[15]

Nonetheless, in PRCCCC's favor, the act does not contain language declaring that the Commonwealth is not responsible for PRCCCC's debt, as was true of the statutory schemes in Metcalf & Eddy, see 991 F.2d at 940, and Royal Caribbean Corp. v. Puerto Rico Ports Authority, 973 F. 2d 8, 11 (1st Cir. 1992).  In that sense, this is a closer case.

b.  Other State Statutes

PRCCCC relies on statutes outside its own enabling act to argue that it is an arm of the state.  It points to the definition of public funds set forth in 33 P.R. Laws Ann. § 3022(11), (14), which provide:

> (11) Commonwealth of Puerto Rico -- Comprises its municipalities, agencies, public corporations, political subdivisions and other dependencies or instrumentalities.
>
> (14) Public funds or public treasury -- Means all bonds or liabilities and evidences of indebtedness and all moneys belonging to the Government of the Commonwealth of Puerto Rico, the municipalities, agencies, public, municipal and state corporations, political subdivisions

---

[15] Interestingly, PRCCCC's own evidence showed that one of the purposes of creating the public corporation was that public funds allocated to the hospital "could be insulated from the budgetary constraints the [Commonwealth's] Health Department always had."  Another purpose was to serve as "justification to 'privatize' the health system."  These are also indicia that the Commonwealth wanted PRCCCC to be at arm's length, not to be an arm of the state.

-26-

and other dependencies, and all moneys, securities, bonds and evidences of indebtedness received and kept by officials or employees of the aforementioned entities, in their official character.

We reject for four reasons the contention that this definition of public funds is a statement that all "public corporations" established by Puerto Rico are arms of the state. First, the definitions are explicitly limited to the subtitle in which they appear, a part of the Penal Code of Puerto Rico. See id. § 3022. Second, when Puerto Rico has chosen to make an entity an arm of the state, it has used other language. For example, the Medical Services Administration (MSA), another health care entity created by the Commonwealth,[16] was "created as an instrumentality of the Government of the Commonwealth of Puerto Rico, attached to the Commonwealth Department of Health . . . under the direction and supervision of the Secretary of Health." 24 P.R. Laws Ann. § 342b; see Rodriguez Diaz v. Sierra Martinez, 717 F. Supp. 27, 29-31 (D.P.R. 1989). Third, it is a maxim of statutory construction that the more specific statute, here PRCCCC's enabling act, governs over the more general, such as the definitions in § 3022. See In re

---

[16] PRCCCC witness Zapata asserts claims that the structure of the PRCCCC is "similar, if not identical" to that of the public medical center known (in English) as the Medical Services Administration (MSA). This is untrue, as discussed above. Furthermore, unlike the PRCCCC enabling legislation, see 24 P.R. Laws Ann. §§ 343-343k, the MSA enabling legislation provides that civil litigants against the MSA are subject to the cap on recovery established under the Commonwealth's state sovereign immunity, 24 P.R. Laws Ann. § 343g.

Weinstein, 272 F.3d 39, 43 (1st Cir. 2001). Fourth, such a construction would be inconsistent with a number of our cases finding various public authorities and corporations created by Puerto Rico not to be arms of the state. See, e.g., Metcalf & Eddy, 991 F.2d 935; Royal Carribean Corp., 973 F.2d 8 (Breyer, C.J.).

c. State Court Decisions

Apart from the statutory schemes, we consider how the state courts have treated PRCCCC. The Supreme Court has found state court decisions a useful resource. See Hess, 513 U.S. at 45; Moor, 411 U.S. at 720-721. PRCCCC has not provided us with a single opinion from a court of Puerto Rico holding that PRCCCC is part of the government of Puerto Rico, or, for that matter, that the Commonwealth will stand behind PRCCCC's debt.[17] It is PRCCCC's burden to do so. See Wojcik, 300 F.3d at 99; Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002); Skelton v. Camp, 234 F.3d 292, 297 (5th Cir. 2000).

PRCCCC points to the Penal Code, stating that PRCCCC employees are considered public employees under the Penal Code of Puerto Rico. The Penal Code's definition of a public employee, which is expressly limited to the subtitle in which it appears, see

_____

[17] PRCCCC refers to a 1987 opinion by the Attorney General; we do not read that opinion as supporting PRCCCC even assuming, dubitante, that it has some authoritative value.

-28-

33 P.R. Laws Ann. § 3022, includes persons working for municipal and local government bodies and other entities that do not enjoy Eleventh Amendment immunity, see id. § 3022(16). Meanwhile, other statutory definitions of public employee seem to exclude PRCCCC employees. See, e.g., 3 P.R. Laws Ann. § 729c(b) (chapter on compensation and benefits of government personnel adopts definition of employee that specifically excludes "the officials and employees of the public corporations and of the University of Puerto Rico").

d. Functions of PRCCCC

PRCCCC contends that its functions are those of a government. If true, that would assist its structural argument. PRCCCC points to no judicial authority to support its proposition. Instead, it offers three arguments.

First, Zapata contends that PRCCCC is an essential component of the Commonwealth's strategy to comply with its obligation, under the Constitution of Puerto Rico, Article II, Section 20, to provide health care to indigent residents. It appears Section 20 is not binding. The Constitution of Puerto Rico had to be approved by the U.S. Congress before going into effect. Figueroa v. People of P.R., 232 F.2d 615, 620 (1st Cir. 1956). Congress conditioned its approval of the Puerto Rico Constitution partly on deletion of Article II, Section 20. See Pub. L. No. 82-447, 66 Stat. 327, 327 (1952). Furthermore, Article II, Section 20 appears to have been intended as an aspirational statement, modeled

on language in the Universal Declaration of Human Rights, rather than as a basis for legal obligations.  The Section enumerates a list of human rights including the right to work, the right to an adequate standard of living, and the right to medical care; it then states, "The rights set forth in this section . . . require, for their full effectiveness, sufficient resources and an agricultural and industrial development not yet attained by the Puerto Rican community."  (emphasis added).

Second, PRCCCC's enabling legislation says that it will be responsible for public policy relating to the provision of cardiovascular services in Puerto Rico.  24 P.R. Laws Ann. § 343b. PRCCCC presents no evidence indicating that it has helped set policies applicable to other facilities in Puerto Rico.  It acknowledges, moreover, that since the Commonwealth carried out a major health reform in 1993, PRCCCC has competed with private hospitals for legislative appropriations and other pubic funds allocated for cardiovascular surgery.[18]  This reform presumably diminished any policymaking function of PRCCCC.

Third, Zapata observes that PRCCCC's mission includes training medical students, interns, and residents from the University of Puerto Rico (a public university).  But many hospitals unaffiliated with state governments (or the Commonwealth)

_____

[18] Further, Watson notes that PRCCCC functions with respect to its vendors like a private, rather than a government, hospital.

employ (and train) interns and residents from state medical schools.

The provision of medical care, in our economy, is not primarily a state function. Even medical care for the poor is a responsibility often imposed on private hospitals, through free care pools, Medicaid, and other devices. The difficulty of containing costs for these services may be exactly why Puerto Rico has chosen in PRCCCC's enabling act not to make its treasury accountable for PRCCCC's debts. That PRCCCC receives Medicaid funding does not distinguish it from a private sector hospital, either not-for-profit or for-profit. A mosaic of medical providers serves the poor and the uninsured, and nothing about PRCCCC marks it as serving a uniquely governmental function.

e.  Control by the State

PRCCCC also argues that it is subject to a fair degree of control by the Commonwealth. Under the enabling act, the Board is composed of seven members, three of whom are ex officio members and are high-ranking state officials. 33 P.R. Laws Ann. § 343(c). The governor appoints the remaining four members to four-year terms. The Secretary of Health of Puerto Rico is chairman of the Board. The votes of four members are needed for action; thus the ex officio members presumably vote.

-31-

The governor's appointment power over the board is not enough in itself to establish that PRCCCC is an arm of the state. See Auer, 519 U.S. at 456 n.1. The statute itself does not give the governor power to remove Board members, and it is unclear where such power resides.[19] Nor does the statute give the Commonwealth veto power over the decisions of the Board, a key element of control.

In her statement, Lúgaro asserts that the governor intervenes periodically in PRCCCC management and personnel issues. She asserts that the Commonwealth's Comptroller audits PRCCCC. She also says that the Executive Director and other key PRCCCC personnel have to file annual reports with the Government Ethics Office. These are indicia of control, but hardly determinative in view of the statutory structure.[20]

---

[19] PRCCCC, which bears the burden of proof, offers only inadmissible hearsay evidence on this point. See Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.").

[20] Even the view of the dissent in Hess on the importance of control does not assist PRCCCC. Though it does not propose a bright-line rule demarcating the level of control necessary to warrant a finding that an entity is an arm of the state, the Hess dissent does observe that such a finding is warranted "if the State appoints and removes an entity's governing personnel and retains veto or approval power over an entity's undertakings." Hess, 513 U.S. at 61 (O'Connor, J., dissenting); see Brotherton v. Cleveland, 173 F.3d 552, 561 n.5 (6th Cir. 1999). Key elements of control, such as veto power, are absent here.

We cannot say the indicia all point in the direction of PRCCCC being an arm of the state and so reach the second stage of the analysis.

2.   Would the Commonwealth's Treasury Be Obligated to Pay a Judgment Against PRCCCC?

Our next inquiry is whether any judgment in this action would be paid by the Commonwealth's treasury.  As Hess explained, "If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?  When the answer is 'No' -- both legally and practically -- then the Eleventh Amendment's core concern is not implicated."  513 U.S. at 51.  Thus we examine two areas:  what is said by state law on the topic[21] and what in fact has happened.

The enabling act does not, as we have said, make the Commonwealth liable for the debts of PRCCCC.  Still, it could be that the Commonwealth has assumed that obligation in fact, either directly or indirectly, by providing virtually all the funds needed for the operation of PRCCCC.  The facts, discussed below, show that the Commonwealth has not done that.  Rather, the Commonwealth has

---

[21] Zapata states that the team of experts which advised the legislature on the creation of PRCCCC concluded that sixty percent of the hospital's revenues would need to come from legislative appropriations.  If that is so, then the fact that PRCCCC's enabling legislation does not require the legislature to provide a fixed percentage (or other level) of support for PRCCCC is telling.

left itself free to provide or not provide funds to PRCCCC as it sees fit, and it has not come close to obligating itself to assume the burden of paying PRCCCC's debt. The Commonwealth has provided for PRCCCC to have independent sources of revenue and, indeed, the majority of PRCCCC's funding now comes from sources other than the Commonwealth's treasury.

We start with the statutory scheme and consider two factors: the provisions as to funding of debts and any provisions for raising revenues. There are no provisions for funding of PRCCCC's debts, just an admonition in the enabling act that PRCCCC must live within its means. The legislative intent seems to be that PRCCCC not incur debts that it cannot pay from budgeted sums. As to revenue, the statutory scheme contemplates a number of sources of income. The statute provides that PRCCCC may

1. borrow money from any funding source, 24 P.R. Laws Ann. § 343b(g);

2. sell its services to private entities, id. § 343b(k);

3. sell materials to private entities, id. § 343b(m);

4. request and accept federal, state, or other funds and grants, § 343b(o); and

5. enter with others into a corporation, partnership, joint venture, or association, id. § 343b(r).

In addition, the statute provides that PRCCCC may issue bonds, id. § 343k. It is noteworthy that the Commonwealth is not a guarantor on the bonds.

PRCCCC replies that the capacity to issue bonds and raise revenues is a "dead letter." That is because private lenders will not provide financing "unless the Commonwealth funds are pledged as warranty of payment through the Office of Management and Budget. With an operating deficit that exceeds an [annual] average of $7 million . . . PRCCCC does not have the credit that will enable it to borrow money and obtain loans, much less issue bonds." Though relevant, this evidence does not show that PRCCCC's debts would become the Commonwealth's.

PRCCCC also points to the language of the 1986 appropriations act, which provided PRCCCC with $500,000 in initial working capital. Act of June 30, 1986, No. 51, at p. 170, § 13, quoted in 24 P.R. Laws Ann. § 343, history. The bill also said:

> The funds needed in subsequent years to carry out the purposes of this act [chapter] shall be consigned in the General Expense Budget of the Government of Puerto Rico.

Id. There are three responses to the argument. First, this is language in an appropriations act for a particular year. Such acts normally expire within the year, and PRCCCC has not presented any argument that the language must be read to extend to all future years. See Minis v. United States, 40 U.S. (15 Pet.) 423, 445 (1841). Second, this language was not put into the codified law enacted in 1986, nor has it been added since then. Third, in

practice the legislature did not consider itself bound by that language in years after 1986.

PRCCCC's other argument is that it is required to submit an operating expenses and capital investments budget to the legislature. 24 P.R. Laws Ann. § 343h. That alone does not show that PRCCCC's debts will be paid by the Commonwealth; it is better read as imposing discipline meant to discourage PRCCCC from building up unpaid debts. There is, moreover, no evidence in the record (and the burden is on PRCCCC) that PRCCCC took any steps to comply with this requirement before February 25, 2002, more than three months after it formally asserted an Eleventh Amendment defense to FMC's lawsuit.[22]

We turn to what in practice has happened. "If the state substantially funds the entity, those funds would be a probable source to satisfy any judgment against the entity. On the contrary, if the entity has taxing powers and can issue bonds, state funds might not be at risk in litigation against the entity." Moore's, supra, § 123.23[4][b], at 123-57 to 123-58.

PRCCCC witness Bustelo states that PRCCCC receives several types of financial support from government entities: (a) legislative appropriations; (b) reimbursements from insurance

---

[22] On February 25, 2002, Lúgaro requested a legislative appropriation to pay the rent during FY 2001 and FY 2002 and cover the rest of PRCCCC's deficit.

companies linked to the Department of Health; (c) payments from the City of San Juan; and (d) "indirect subsidies," which are effectively short-term loans, from public utilities and other public corporations. Because of PRCCCC's relationship to the state, Bustelo contends, public corporations such as PRCCCC's landlord have not initiated eviction proceedings or otherwise denied services when PRCCCC's payments were late.

We start with the most recent history. In FY 2001, PRCCCC received over $50 million in revenues. It received nothing in legislative appropriations, although it was running a $12 million deficit. In FY 2002, it _again_ received no legislative appropriation. Most of PRCCCC's revenues are from fees for patient services received from private insurance companies, patients, Medicare, Medicaid, or the Commonwealth's public health system,[23] just as revenues come in to private hospitals in Puerto Rico. Looking back further, PRCCCC's legislative appropriations amounted to less than 14 percent of its total revenues from fiscal years 1993 to 2001.

---

[23] Although the Commonwealth participates in Medicare and Medicaid, it also has a separate public health system. Medicare is a federally funded program overseen by part of the federal government; Medicaid is a jointly funded federal-state program overseen by federal and state entities but usually administered at the county level. By contrast, the Commonwealth's own public health system receives no federal funding.

In its role as an insurer, the Commonwealth also reimbursed PRCCCC for particular medical procedures. Even counting these reimbursements, the share of PRCCCC revenues coming from the Puerto Rico government between FY 1993 and 2001 was about 41 percent. These reimbursements were presumably made under the Commonwealth's public health system and the Medicaid program. Since private, for-profit hospitals receive these reimbursements as a matter of course, it is doubtful whether they should be counted for Eleventh Amendment purposes. We do not count payments made by the municipality of San Juan as revenue from the state treasury.

Overall, the share of funding provided by the legislature and by the Commonwealth as a whole has diminished sharply over time. In FY 1993 and 1994, the first two years for which figures are available, the legislature provided approximately 21 percent of PRCCCC's revenues by appropriation. Counting insurance reimbursements as well as appropriations, the Commonwealth provided over 64 percent of PRCCCC's revenues during that period. In FY 2000 and 2001, the last two years for which complete figures are available, the legislature provided approximately 8 percent and the Commonwealth in toto provided approximately 26 percent of its revenue. As noted above, the legislature provided no appropriation whatsoever during FY 2001 or FY 2002. The elimination of any legislative appropriations presumably reflects the fact that PRCCCC's operational revenues -- that is, its fees from providing

cardiovascular medical care to patients -- increased by approximately 400 percent between FY 1993 and FY 2001.

PRCCCC argues that this accounting understates the Commonwealth's actual contribution to PRCCCC because public utilities and other allegedly government-controlled public corporations have allowed PRCCCC to receive services without paying for them. The record refutes this argument. Like virtually all businesses, PRCCCC has accounts payable: bills from suppliers for goods and services purchased on credit. There is every indication that, as a general practice, PRCCCC pays its accounts to public utilities and other public corporations. For example, Bustelo stated that the legislative appropriation has been used mainly to pay PRCCCC's largest account payable: its debt to the Public Housing Administration (PHA), the state agency that owns its physical plant. PRCCCC has not shown that it has failed to pay any debt, apart from its FY 2001 debt to the PHA, in a timely fashion. Moreover, the FY 2001 PHA debt was only unpaid as of March 2002, and accounts payable are typically due within 12 months.

Between FY 1993 and FY 2001, PRCCCC's operational expenses exceeded its total revenues by approximately $18 million. The income statement does not provide any detail on the hospital's debt structure; nevertheless, there is no evidence distinguishing this level of debt for an institution whose operational revenues now exceed $50 million per year from private sector debt. PRCCCC's

operational revenues have grown at a substantially steeper rate than its operational expenses between FY 1993 and FY 2001.

The fact that PRCCCC receives significant, but diminishing, state funding (now less than thirty percent counting all sources, including insurance) is simply not enough to enable it to claim Eleventh Amendment immunity. Mt. Healthy, 429 U.S. at 280. In the end, PRCCCC's argument is simply that a judgment would deplete its operating funds, that the Commonwealth might choose to rescue it, and that this would indirectly deplete the state treasury. We rejected this very argument in Metcalf & Eddy, 991 F.2d at 941, and do so here.

C. Insufficiency of Service of Process

The district court made factual findings regarding the Rule 12(b)(2) and the associated Rule 12(b)(5) claims. See Rivera-Flores v. P.R. Tel. Co., 64 F.3d 742, 748 (1st Cir. 1995). Findings of fact by the district court may not be set aside unless they are clearly erroneous. Fed. R. Civ. P. 52(a); Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985). There was no error.

Rule 4(h)(1) governs service of process upon corporations. Proper service under Puerto Rico law satisfies Rule 4(h)(1). See Sea-Land Serv., Inc. v. Ceramica Europa II, Inc., 160 F.3d 849, 853 (1st Cir. 1998). Under Puerto Rico law, process can be served by "leaving [a copy of the summons and complaint] at the

registered office or other place of business of the corporation in the Commonwealth."  14 P.R. Laws Ann. § 3126 (2000).  Plaintiff unquestionably met this requirement.

### III.

We **affirm** the district court's decisions that PRCCCC is not an arm of the state and so is not entitled to Eleventh Amendment immunity and that there was adequate service of process. Costs are awarded to plaintiff.