**Milagros RIVERA TORRES, Plaintiff**

v.

**JUNTA DE RETIRO PARA MAESTROS, Defendant.**

Civil No. 04–2226 (GAG).

United States District Court, D. Puerto Rico.

Aug. 23, 2007.

Peter John Porrata, Peter John Porrata Law Office, San Juan, PR, for Plaintiff.

Anita Montaner–Sevillano, McConnell Valdes, Francisco A. Ojeda–Diez, P.R. Department of Justice, Federal Litigation, Pedro J. Salicrup, Salicrup & Assoc., San Juan, PR, for Defendant.

### ORDER ADOPTING REPORT AND RECOMMENDATION

GUSTAVO A. GELPÍ, District Judge.

The plaintiff, Milagros Rivera Torres ("Rivera"), filed this action against the defendant, Sistema de Retiro para Maestros ("SRM"),[1] alleging violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634, and Puerto Rico Law No. 100 of June 30, 1959, P.R. Laws Ann. tit 29, §§ 146–151. *See* Docket Nos. 1, 48. SRM moved to dismiss the complaint on Eleventh Amendment immunity grounds. *See* Docket No. 40. District Judge Jay A. Garcia–Gregory[2] denied the motion to dismiss holding that SRM failed to demonstrate that it is an "arm" of the Commonwealth of Puerto Rico. In reaching this conclusion, Judge Garcia–Gregory primarily relied upon SRM's Enabling Act, P.R. Laws Ann. tit. 18, §§ 391–392w. *See* Docket No. 52. SRM moved for reconsideration of Judge Garcia–Gregory's opinion

---

1. SRM is identified in the caption by its former name, Junta de Retiro para Maestros.

2. Judge Garcia–Gregory subsequently transferred the case to the undersigned district judge. *See* Docket No. 59.

and order. *See* Docket Nos. 53, 55. The court referred the motion Magistrate Judge Marcos E. López for a report and recommendation. *See* Docket No. 62. The parties fully briefed the Eleventh Amendment immunity issue, and Magistrate Judge López conducted a hearing on the same. *See* Docket Nos. 61, 66, 68, 70. After conducting a thorough analysis of the pertinent facts, SRM's Enabling Act, and other applicable law, the Magistrate Judge recommended denial of SRM's motion for reconsideration. *See* Docket No. 72. SRM timely objected to the report and recommendation. *See* Docket No. 73. Rivera responded to SRM's objections. *See* Docket No. 76.

■ After conducting a *de novo* review of the report and recommendation and SRM's specific objections thereto, the court finds no reason to depart from Judge Garcia–Gregory and Magistrate Judge López' determinations.[3] As part of its *de novo* review of the report and recommendation, the court fully considered the Commonwealth's position, which essentially re-states SRM's arguments.[4] Moreover, SRM's assertion that it does not maintain a reserve fund to satisfy labor judgments, notwithstanding information on its website to the contrary, does not alter the court's conclusion.[5] SRM has failed to carry its burden to demonstrate that it is an "arm" of the Commonwealth for purposes of Eleventh Amendment immunity.

■ The Eleventh Amendment bars suits against states for money damages unless the state waives its immunity or consents to suit. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Metcalf & Eddy v. P.R. Aqueduct & Sewer Auth.,* 991 F.2d 935, 938 (1st Cir.1993). Eleventh Amendment immunity extends to "arms" or "alter egos" of the states. *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.,* 322 F.3d 56, 61 (1st Cir.2003); *Royal Caribbean Corp. v. P.R. Ports Auth.,* 973 F.2d 8, 9 (1st Cir.1992).

■ The question of whether an entity is an "arm" of the state, and thus entitled to Eleventh Amendment immunity, is an issue of federal law. *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). It is well-established that the Commonwealth of Puerto Rico is considered a state for Eleventh Amendment purposes. *See P.R. Ports Auth. v. M/V Manhattan Prince,* 897 F.2d 1, 9 (1st Cir.1990). The entity seeking Eleventh Amendment immunity bears the burden of providing convincing evidence that it is an "arm" of the state. *Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 99 (1st Cir.2002).

■ To determine whether a government instrumentality is an "arm" of the state, the court applies a two-step analysis that focuses on the entity's structure and the vulnerability of the state's purse. First, the court analyzes whether the state clearly structured the entity to share its

---

3. The court must conduct a *de novo* determination of those portions of a report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)

4. Magistrate Judge López also considered the Commonwealth's position in preparing his report and recommendation. *See* Docket No. 72, p. 2.

5. SRM objects to Magistrate Judge López' *"sua sponte* review" of the SRM website. Docket No. 73, p. 8, n. 15. SRM overlooks the fact that Rivera, in her opposition to the motion to dismiss, explicitly references the portion of the website pertaining to the labor reserve. *See* Docket No. 47, p. 7, n. 1.

sovereignty. Second, if the structural indicators point in different directions, the court assesses the risk of damages being paid from the state's treasury. *Pastrana–Torres v. Corporación De P.R. Para La Difusión Pública,* 460 F.3d 124, 126; *Fresenius,* 322 F.3d at 68.

In this case, the structural indicators point in different directions; they do not demonstrate that the Commonwealth "clearly structured" SRM to share its sovereignty. *Fresenius,* 322 F.3d at 68. Consequently, the dispositive question concerns the risk that damages will be paid from the Commonwealth's purse. The Commonwealth is not legally bound to pay SRM's indebtedness. Nor do the facts concerning the Commonwealth's financial contributions and obligations to SRM indicate that a judgment against SRM would directly or indirectly "deplete the state treasury." *Id.* at 75. SRM, therefore, has not demonstrated with convincing evidence that it is an "arm" of the Commonwealth for purposes of Eleventh Amendment immunity.

Accordingly, the court reaffirms Judge Garcia–Gregory's denial of the motion to dismiss. The court **ADOPTS** Magistrate Judge Lopez' report and recommendation (Docket No. 72) in its entirety and **DENIES** SRM's motion for reconsideration (Docket Nos. 53, 55).

## IV. Conclusion

**SO ORDERED.**

## REPORT AND RECOMMENDATION

LÓPEZ, United States Magistrate Judge.

### I. PROCEDURAL BACKGROUND

On November 5, 2004, plaintiff Milagros Rivera Torres (hereinafter referred to as "Rivera") filed a complaint against defendant Junta de Retiro para Maestros (hereinafter referred to as "SRM" in reference to "Sistema de Retiro para Maestros") pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (hereinafter referred to as "ADEA") and Puerto Rico Act. No. 100, 29 L.P.R.A. § 146 *et seq.* Docket 1. SRM answered the complaint on January 5, 2005. Docket 7.

A Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) was filed by SRM on May 3, 2006, alleging that the Eleventh Amendment to the United States Constitution precludes plaintiff from filing the instant suit under ADEA. Docket 40. An opposition to said motion and an amended complaint were filed on June 1, 2006. Dockets 47–48. A reply to the opposition was filed on June 12, 2006. Docket 49.

On September 25, 2006, the Honorable Judge Jay A. García Gregory issued an opinion and order regarding the motion to dismiss on immunity grounds. In said opinion and order, the Court denied the motion to dismiss indicating that SRM had failed to show that it is an "arm" of the Commonwealth of Puerto Rico (hereinafter referred to as "Commonwealth") for Eleventh Amendment purposes. In its reasoning, the Court stated that SRM's Enabling Act creates an "entity independent and separate from others of the Government of Puerto Rico." 18 L.P.R.A. § 391b. Moreover, the Court noted that SRM "is explicitly empowered to sue and be sued, and 'to prepare and approve an expense budget for its government and administration.'" 18 L.P.R.A. § 391d(a) and (c). Furthermore, the Court placed particular emphasis on Section 61 of the Enabling Act which provides that

[a]ll debts, obligations, and responsibilities, including the active pensions of the teachers and their beneficiaries, as well as the obligation to fulfill and the right to receive the benefits of any judgment that may be pronounced against or in favor the Teacher's Retirement Board

after the approval of this Act, are hereby transferred to the [SRM].

18 L.P.R.A. § 391(nt).

On October 5, 2006, SRM moved the Court to reconsider its opinion and order denying the motion to dismiss. Dockets 53 and 55.[1] An opposition to the motion for reconsideration was filed by plaintiff on November 28, 2006. Docket 61. Subsequently, the motion for reconsideration was referred by the Honorable Judge Gustavo A. Gelpí to the undersigned magistrate judge for a report and recommendation. Docket 62.[2]

A special appearance was also made on the matter of reconsideration by the Commonwealth on February 1, 2007. Docket 66. A brief opposition to the Commonwealth's motion was filed by plaintiff on

February 8, 2007. Docket 68. A hearing on the motion for reconsideration and related motions was held on May 16, 2007.

## II. LEGAL FRAMEWORK[3]

■■■■ The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Despite the clear language of the Eleventh Amendment, has been extended to apply to suits against a particular state by its own citizens. *León López v. Corporación Insular de Seguros*, 931 F.2d 116, 121 (1st Cir.1991). It is well established that the Commonwealth is con-

---

1. Docket 53 contains an unsigned statement under penalty of perjury by Harold González Rosado, Executive Director for SRM; Docket 55, on the other hand, contains a scanned copy of the statement signed by Mr. González Rosado.

2. This case was transferred from the Honorable Judge Jay A. García Gregory to the Honorable Judge Gustavo A. Gelpí on November 13, 2006. Docket 59.

3. Although SRM's motion to dismiss has been filed under Federal Rule of Civil Procedure 12(b)(6) (motion to dismiss for failure to state a claim), a claim that a lawsuit is barred by the Eleventh Amendment is properly addressed in a 12(b)(1) motion. *See Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n. 2 (3d Cir.1996) (stating that "Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction"). *See also Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1259 (10th Cir.2002) (addressing the sovereign immunity issue in the context of subject matter jurisdiction). Pursuant to Fed.R.Civ.P. Rule 12(b)(1), a defendant may move to dismiss an action for lack of subject matter jurisdiction. As courts of limited jurisdiction, federal courts have the duty of narrowly construing jurisdictional grants. *See e.g., Alicea–Rivera v. SIMED*, 12 F.Supp.2d 243, 245 (D.P.R.1998). Since federal courts have limited jurisdiction, the party

asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. *See Murphy v. United States*, 45 F.3d 520, 522 (1st Cir.1995); *Droz–Serrano v. Caribbean Records Inc.*, 270 F.Supp.2d 217 (D.P.R.2003).

"When considering a motion to dismiss under Rule 12(b)(1), a district court must distinguish between facial and factual challenges to its subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). 'In a facial attack, a defendant argues that the plaintiff did not properly plead jurisdiction ... [whereas] a "factual" attack asserts that jurisdiction is lacking on the basis of facts outside of the pleadings.' *Smolow v. Hafer*, 353 F.Supp.2d 561, 566 (E.D.Pa.2005).... In reviewing a facial attack ..., 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.' *Gould Elecs. v. U.S.*, 220 F.3d 169, 176 (3rd Cir. 2000).... When a factual attack is made, however, the court is not confined to the allegations in the complaint and 'can look beyond the pleadings to decide factual matters relating to jurisdiction.' *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000)." *Hutchinson v. Commonwealth of Pa. Dept. Of Public Welfare* (2005 WL 2562721) p. 1–2 and n. 2. (not reported).

sidered a state for Eleventh Amendment purposes. *P.R. Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 9 (1st Cir.1990).

■ The state's interests in asserting Eleventh Amendment immunity are to protect its public treasury and its dignity as a sovereign in not being haled into federal court. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002). "[T]he amendment's raiment unravels if any one of four circumstances eventuates: a state may randomly consent to suit in a federal forum; a state may waive its own immunity by statute or the like; Congress may sometimes abrogate state immunity (so long as it speaks clearly and acts in furtherance of particular powers); or under certain circumstances other constitutional imperatives may take precedence over the Eleventh Amendment's federal-court bar." *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Authority*, 991 F.2d 935, 938 (1st Cir.1993).

■ The issue of whether a particular entity is an arm of the Commonwealth is a question of federal law. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Said inquiry, however, "can be answered only after considering the provisions of state law that define the agency's character." *Id.*

■ The entity seeking protection under the Eleventh Amendment bears the burden of providing convincing evidence that it is indeed an arm of the state. *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 99 (1st Cir.2002). In reaching a determination of whether a particular entity is protected by the Eleventh Amendment, a two-step analysis is conducted: First, "[h]as the state clearly structured the entity to share its sovereignty?" *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 68 (1st Cir.2003). Among the factors to be considered when evaluating an entity's structure are:

(1) whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees;

(2) whether the agency's function is governmental or proprietary;[4]

(3) whether the agency is separately incorporated;[5]

(4) whether the state exerts control over the agency, and if so, to what extent;[6]

(5) whether the agency has the power to sue, be sued, and enter contracts in its own name and right;

(6) whether the agency's property is subject to state taxation; and

(7) whether the state has immunized itself from responsibility for the agency's acts or omissions.[7]

*Metcalf & Eddy, supra*, at 939–940.

■ With respect to this first prong of the test, the degree of control asserted by

---

4. This factor has also been described as "whether the entity's functions are readily classifiable as state functions or local or nongovernmental functions." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

5. It is also relevant to determine "how the enabling and implementing legislation characterized the entity and how the state courts have viewed the entity." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

6. As the Supreme Court has stated, the "extent of state control including through the appointment of board members and the state's power to veto board actions or enlarge the entity's responsibilities." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

7. Or "whether the state bore legal liability for the entity's debts." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

the state is of significant importance. *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 68 (1st Cir.2003). Second, "[i]f the factors assessed in analyzing the structure point indifferent directions, then the dispositive question concerns the risk that the damages will be paid from the public treasury ... This analysis focuses on whether the state has legally or practically obligated itself to pay the entity's indebtedness." *Id.*

## III. ANALYSIS

### A. Whether SRM is clearly structured to share the sovereignty of the Commonwealth of Puerto Rico

None of the following factors by itself is determinative or conclusive as to whether SRM is protected by the Eleventh Amendment; each of them must be taken into account for purposes of having a panoramic view of whether said entity is structured to share the sovereignty of the Commonwealth.

### 1. Whether the SRM has the funding power to enable it to satisfy judgments without direct state participation or guarantees.

Plaintiff claims that SRM "generates $383,713,200 in income none of which comes from the Central Government and maintains a reserve fund of over one million dollars for labor and ADA complaints." Docket 47, p. 7, n. 1. A review of SRM's website (*www.srm.gobierno. pr*), cited by plaintiff, shows in a document titled Executive Summary of Transition Report of the Teachers' Retirement System (translation ours) that for the year 2005, SRM had projected revenues totaling $383,713,200, but also expenses totaling $384,920,943 (of which $307,000,000 were pension payments and $1,050,000 were part of the "labor reserve"). Assuming *arguendo* that a one million dollar reserve indeed currently exists at SRM for labor complaints, the Court notes that plaintiff is seeking in this case: (a) in excess of $4,000,000 in compensatory damages; (b) in excess of $8,000,000 in punitive damages; (c) back pay, front pay, and related benefits and interests in an amount no less than $150,000; (d) costs, together with reasonable attorney's fees; and (e) prejudgment interest. Docket 1 at p. 5 and Docket 48 at p. 5. Hence, if plaintiff were to prevail in this case, the so-called labor reserve could possibly be insufficient to satisfy the judgment entered, although these circumstances cannot be predicted with certainty at this juncture of the proceedings. Of course, this hypothetical situation would not necessarily preclude SRM from digging deeper into its coffers beyond the reserve, particularly taking into account the fact that according to the Executive Summary of Transition Report of the Teachers' Retirement System, SRM was expecting a positive increase in net assets of $35,921,552 (from $142,870,705 in 2004 to $178,792,257 in 2005).

SRM claims that almost half of the funds that feed the Teacher's Annuities and Pension Fund come from the state. Docket 49 at p. 9 n. 5. While members of SRM contribute nine percent (9%) of their salaries to the fund, the Commonwealth automatically contributes eight and a half percent (8.5%) of the total monthly salary paid to all teachers. 18 L.P.R.A. § 391nt, Sections 14(b)-(c); and 18 L.P.R.A. § 392*l*.[8] Furthermore,

---

8. Whether the 8.5% contribution from the state is not directly from the Legislature, but rather indirectly through the Department of Education, as plaintiff claims (Docket 61, p. 7), is inconsequential.

SRM's Executive Director has asserted in a statement under penalty of perjury that: (a) 56% of the contributions made to SRM's Fund during 2004 came directly from appropriations made by the Legislature from the General Expense Budget of the Commonwealth;[9] (b) SRM's financial statements are part of the financial statements of the General Budget of the Commonwealth; (c) any budgetary deficiencies of SRM are reported as general budgetary deficiencies of the Commonwealth; and (d) in case of economic insolvency of SRM's Pension and Annuities Fund, the Commonwealth is obliged to provide the necessary funds to maintain the solvency of SRM. Docket 55, Exhibit 1. Plaintiff argues, however, that when listing the agencies that receive contributions from the General Expenses Budget of the Commonwealth, SRM is not named, independently as an agency or as part of the Education Department's budget. Docket 61, p. 7 (citing *www.presupuesto.gobierno.pre/ Tomo_II/indiceAgencias. htm; www. presupuesto.gobierno.pr/Tomo_II/ education.htm.*)

From a structural point of view, it cannot be concluded categorically that SRM has or lacks the capability to satisfy judgments without direct state participation or guarantees because we must be careful not to intermingle recurrent revenues and expenses with non-recurrent sources of appreciation committed to the solvency of the pension fund.[10] The presence of a reserve for labor related complaints and the increase in net assets expected during 2005 suggest that SRM has prepared itself for such eventuality, but other structural factors must be evaluated.

### 2. Whether SRM's function is governmental or proprietary.

██ Plaintiff claims that with the Enabling Act of 2004, SRM acquired a purpose clearly commercial in nature. Docket 61 at p. 5. In support of its allegation that SRM's function is not governmental anymore, plaintiff argues that the 2004 SRM Enabling Act allotted SRM more ample faculties in order to better manage the system such as operating investment plans and other activities similar to the ones carried out by banks and private enterprises. *Id.*

It is true that SRM enjoys more flexibility and latitude in its investment options than its predecessor, the Teacher's Retirement Board. *E.g.,* 18 L.P.R.A. §§ 392h, 392i, 392k, 392t. The wide range of investment alternatives that SRM currently enjoys, however, does not automatically transform SRM into a commercial venture.

The legislative intent of the Enabling Act makes it clear that SRM was not created to have a commercial function:

> The Teacher's Retirement System [...] is not a public corporate instrumentality of the Government of Puerto Rico. **Likewise, it does not have the commercial function nor does it operate for profitable purposes.** With the approval of this Act, we are not designing [an] agency of the Central Government to operate as a private enterprise or business, since its main purpose is to administer the annuities and pensions of the teachers of Puerto Rico as a service organization for their members.

Declaration of Legislative Motives, 2004 PR ALS 91 (emphasis ours).

---

9. During the hearing held on May 16, 2007, counsel for SRM indicated that said percentage has remained approximately the same during the years 2005–2007.

10. Whether from a pragmatic point of view the Commonwealth has obliged itself to satisfy SRM's judgments, however, is something will be addressed later.

Even though the means of achieving its purpose were broadened significantly through the Enabling Act of 2004, SRM's mission remains the same in nature as the one of its predecessor: "[T]he purpose of the Retirement Board is to administer the system of annuities and pensions of the teachers of Puerto Rico. It has no commercial purposes; it does not operate for profit. Its main function is to give service to its members. Both the teachers' system of annuities and pensions and the Board which administers it are charitable organizations having the character of a public assistance office." *Junta De Retiro Para Maestros v. Junta De Relaciones Del Trabajo De Puerto Rico,* 1979 WL 59131, 108 D.P.R. 448, 458 (1979). *See also Junta De Relaciones Del Trabajo De PR v. Junta De Retiro Para Maestros,* 127 D.P.R. 621 (1990). The legislative intent of the Enabling Act of 2004 echoes the description given by the Supreme Court of Puerto Rico in 1979 of the teachers' system of annuities and pensions prior to the creation of SRM. The Court, therefore, disagrees with plaintiff's characterization of SRM as an entity clearly commercial in nature.[11]

### 3. Whether SRM is separately incorporated.

The complaint alleges that SRM is a government entity duly organized under the Laws of the Commonwealth. Docket 40 at p. 6; Docket 1 at ¶ 3. Said allegation has not been disputed by SRM. More importantly, however, the Enabling Act of 2004 provides that the "Teacher's Retirement System ... shall be organized as an entity independent and separate from others of the Government of the Commonwealth of Puerto Rico." 18 L.P.R.A. § 391b. Therefore, we need not delve any deeper into this factor of the equation.[12]

### 4. Whether the Commonwealth of Puerto Rico exerts control over SRM, and if so, to what extent.

■ Even though there is some indicia of state control over SRM, the same falls short of being determinative in view of the statutory structure. SRM displays substantial independence from the Commonwealth in various matters. For example, SRM has been granted the authority to "[p]repare and approve an expense budget for its government and administration." 18 L.P.R.A. § 391d(c).

11. SRM claims that on at least two occasions the Supreme Court of Puerto Rico has characterized SRM as an arm of the state. Docket 40 at p. 6. The opinion of the state's highest court is entitled to weight and consideration. *Moor v. Alameda County,* 411 U.S. 693, 720, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). In *Junta De Retiro Para Maestros v. Junta De Relaciones Del Trabajo De Puerto Rico,* 1979 WL 59131, 108 D.P.R. 448, 458 (1979) (reaffirmed by *Junta De Relaciones Del Trabajo De PR v. Junta De Retiro Para Maestros,* 127 D.P.R. 621 (1990)), however, the Supreme Court of Puerto Rico was not addressing whether SRM's predecessor was an arm of the state or not, but rather "whether the Brotherhood of Employees could bargain collectively with the Retirement Board" which in turn hinged upon "whether said Board is an employer within the meaning given to that term in the Puerto Rico Labor Relations Act." *Id.* at p. 473. Furthermore, these two cases predate SRM's Enabling Act of 2004. Thus, SRM's reliance on the two cases mentioned above is misplaced for purposes of establishing that it has been clearly defined before as an "arm" or "alter ego" of the Commonwealth.

12. *See Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.,* 322 F.3d 56, 68 (1st Cir.2003) (describing the language of the enabling act creating an "entity which is independent and separate from any other agency or instrumentality of the Government of Puerto Rico" as suggesting that said entity is not an arm of the state).

Furthermore, SRM has the responsibility to "[p]ay the lifetime annual income to the pensioned teachers of the System, ... pay the salaries of its employees and all expenses legally incurred." 18 L.P.R.A. § 391d(h). In addition, with respect to SRM's Board of Trustees, "[o]nce sworn in, those trustees (or their representatives) upon which the responsibility of being the Chairperson of any teacher's organization falls, shall not have the authority to represent their respective organizations, but shall act with full powers and responsibilities as trustees of the Teacher's Retirement System." 18 L.P.R.A. § 391e.

On the other hand, in a statement under penalty of perjury, the Executive Director of SRM, asserts that:

 a. SRM has a substantial functional, structural and economic dependency with the Commonwealth.

 b. The Secretary of the Treasury, along with other members of the Board of Directors, establish the guidelines for all kind of expenditures of SRM.

 c. The Treasury Department of the Commonwealth is in charge of all the distributions of the payroll corresponding to SRM's beneficiaries.

 d. The Puerto Rico Service Labor Relations Act, Act No. 45 of February 25, 1988, as well as Puerto Rico's Administrative Procedure Act apply to SRM.[13]

Docket 55, Exhibit 1.

In support of its position that SRM is controlled by the Commonwealth of Puerto Rico, SRM cites several sections of the Enabling Act: Sections 7, 16, 17, 42, 43, and 47. Docket 55, p. 6 n. 9. Section 7 relates, among other matters, to the composition of SRM's Board of Trustees and the fact that a majority of its members are designated by the Governor of the Commonwealth with the advice and consent of the Senate. 18 L.P.R.A. § 391e. Furthermore, of the nine members of the Board of Trustees, the Secretary of the Treasury of Puerto Rico, the Secretary of Education of Puerto Rico, and the President of the Government Development Bank, or their respective designated representatives, occupy three ex-officio membership positions. *Id.*

The appointment of members of the Board of Trustees by the governor is a relevant factor to be taken into account for purposes of determining the degree of state control over an entity and in the end, the applicability or not of sovereign immunity. *E.g., Power v. Summers*, 226 F.3d 815, 818 (7th Cir.2000) (noting that "[t]he university was created by an Indiana statute, two-thirds of its budget comes from the state and the rest from tuition, and nine of its fourteen trustees are appointed by the governor"). In addition, Section 42 states that SRM "shall be governed by the regulations approved by the Board of Trustees." 18 L.P.R.A. § 392g.[14] Nevertheless, the governor's appointment power of Board members is not enough in itself to establish that an entity is an arm of the state. *E.g., Auer v. Robbins*, 519 U.S. 452, 456 n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). "[W]here the evidence is that

---

13. Plaintiff argues, however, that the Enabling Act does not specifically state that SRM will be subject to the Puerto Rico Administrative Procedure Act. Nevertheless, silence in the Enabling Act does not necessarily imply that the Puerto Rico Administrative Procedure Act does not apply.

14. Although Section 43 also reveals the Board of Trustees' role in financial decisions, this section concerns primarily with the wide array of possible investment alternatives available to SRM, not with the degree of state control exerted by the Commonwealth. 18 L.P.R.A. § 392h(5),(7).

the state did not structure the entity to put the state treasury at risk of paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state." *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 68 (1st Cir.2003).

Furthermore, the statute does not explicitly give the governor power to remove Board members, and it is unclear where such power resides. Nor does the statute explicitly give the Commonwealth veto power over the decisions of the Board. These two aspects are also important elements as to the issue of state control over an entity. *Id.* at 71–72 (1st Cir.2003) and 18 L.P.R.A. § 391e.[15]

Section 16 of the Enabling Act provides that all teachers and employees of SRM shall make a contribution of nine percent of their monthly salary. 18 L.P.R.A. § 391l. Therefore, Section 16 is irrelevant to the issue of the degree of control exerted by the Commonwealth.

Likewise, Section 17 also does not stand for the proposition that the Commonwealth exerts great control over SRM. Said section basically indicates that the Secretary of Education shall withhold the corresponding fees to be contributed by SRM's teachers and that the Secretary of the Treasury is authorized to transfer said fees to the Retirement System Fund. 18 L.P.R.A. § 391m. These are simply administrative tasks that have nothing to do with SRM's authority to make its own decisions re-

garding the way that the fees or funds are going to be invested.

Section 47 also fails to support defendant's contention that the Commonwealth exerts great control over SRM's decisions regarding the management or investment chosen for the teachers' pensions. Section 47 is the counterpart of Section 16. While teachers must contribute under Section 16 nine percent (9%) of their salary, the Commonwealth must contribute a regular appropriation equal to eight and a half percent (8.5%) of the total amount of the annual salaries of all of SRM's teachers. 18 L.P.R.A. § 392l. Thus, Section 47 sheds no light as to the issue of whether the Commonwealth somehow limits SRM's decision-making authority regarding its investments and internal administrative processes.

In sum, although it is clear that the Commonwealth does exert some control over SRM primarily through the governor's designations of members of the Board of Trustees, the control seems indirect and limited rather than direct and substantial.

**5. Whether SRM has the power to sue, be sued, and enter contracts in its own name and right.**

It is undisputed that SRM has the capacity to sue and be sued. 18 L.P.R.A. § 391d. In fact, SRM concedes that it has the power to sue and be sued, but claims that the language used by the statute is not the explicit waiver of Eleventh Amendment immunity required by the Supreme Court. Docket 49 at p. 8. The Court of Appeals

---

**15.** *See also Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 68 (1st Cir.2003) (holding that "where the evidence is that the state did not structure the entity to put the state treasury at risk of paying the judgment, then the fact that the state appoints the majority of the governing board of the agency does not itself lead to the conclusion that the entity is an arm of the state").

for the First Circuit, however, has determined that the inquiry is not as simple as SRM portrays it:

> It is not always clear in the Eleventh Amendment context whether the court has already determined that the entity is an "arm" of the State, and is referring to this provision (power to sue and be sued) only as evidence of an explicit waiver of the dependent entity's sovereign immunity. *See, e.g., Rozek v. Topolnicki,* 865 F.2d 1154, 1158 (10th Cir.1989); *Long v. Richardson,* 525 F.2d 74, 77 (6th Cir.1975); *Soni v. Board of Trustees of Univ. of Tennessee,* 513 F.2d 347, 352 (6th Cir. 1975).... The bare power to sue is unlikely to hold complete sway in the threshold "alter ego" determination either in diversity or immunity cases. *See Kashani v. Purdue Univ.,* 813 F.2d 843, 847 (7th Cir.) *cert. denied* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (power to sue and be sued not conclusive of autonomy); *Jagnandan v. Giles,* 538 F.2d 1166, 1174 and 1176 (5th Cir.1976); *Krieger v. Trane Co.,* 765 F.Supp. 756, 760 and 762 (D.D.C.1991); *cf. Hall v. Medical College of Ohio,* 742 F.2d 299, 305 (6th Cir.1984) (deliberate withholding of power to sue highly probative of lack of autonomy). But the power to sue in the entity's own name, when coupled with other powers of self-determination typically held by distinct juridical entities (power to contract, power to buy, hold, and sell property), undeniably affords the entity some additional independence from the State, since the entity need not seek the State's consent to bring, defend, or settle a lawsuit.

*University of Rhode Island v. A.W. Chesterton Co.,* 2 F.3d 1200, 1207 n. 11 (1st Cir.1993). The Court must take into account the power to sue and be sued coupled with SRM's other powers to determine whether indeed such waiver has taken place. Nevertheless, the fact that SRM has the capacity to sue and be sued is a factor that weighs against SRM's sovereign immunity request.[16]

Furthermore, SRM's Enabling Act confers to said entity the capacity to enter contracts in its own name. For example, SRM has the power to "[s]ell, assign or transfer the amount of the mortgage credits held by ... [SRM]." 18 L.P.R.A. § 391d(m). SRM is also "authorized to contract and pay for the services of the necessary technical personnel" in order to perform actuarial investigations to determine the economic solvency of the Teacher's Annuities and Pension Fund of Puerto Rico. 18 L.P.R.A. § 391(d)(*l*). In addition, SRM's Board of Trustees sets the "standards for administering, leasing, selling, encumbering or executing real property acquired to generate revenues." 18 L.P.R.A. § 391d(k)(3).

SRM concedes that it is allowed to enter into contracts, make loans, issue

---

**16.** *See Vanlaarhoven v. Newman,* 564 F.Supp. 145, 149 (D.R.I.1983) (Holding that "assuming *arguendo* that the state was ultimately liable for judgments against ... [the University of Rhode Island], Rhode Island has waived Eleventh Amendment immunity for the Board and ... [the University of Rhode Island] through the statutory provision giving the Board the right 'to sue and be sued in its own name.' Similar provisions have been interpreted as waivers of immunity for other state universities." (Citations omitted)). Although the First Circuit has espoused a view of the power to sue and be sued clause that is not as determinative and conclusive as *Vanlaarhoven,* it is clear that the presence of said clause in the enabling legislation is a factor that must not be taken lightly in analyzing the waiver of Eleventh Amendment immunity.

bonds, and invest its funds, but claims that said powers are limited by the Enabling Act. Docket 49 at p. 8. In support of its position, SRM cites Sections 13, 14, 42, 43 and 47 of the Enabling Act. Section 13, however, deals with the appointment of SRM's executive director and his power and duties, not with limitations to SRM's ability of entering into contracts, making loans or issuing bonds. *See generally* 18 L.P.R.A. § 391j. Section 14 also does not stand for the proposition that SRM is limited in its ability to enter into contracts, make loans or invest funds. Said section simply specifies the particular way in which the Puerto Rico Teacher's Annuities and Pension Fund had to be transferred at the time that SRM was created. *See generally* 18 L.P.R.A. § 391(nt).

Section 47, once again, does not support SRM's contention that it is limited in its ability to enter into contracts, make loans, issue bonds and invest funds. Section 47 indicates that the Legislature of Puerto Rico, in the government's General Expenses Budget, shall consign a regular appropriation equal to eight and a half percent (8.5%) of the total amount of the annual salaries of all SRM teachers employed by the Commonwealth. *See* 18 L.P.R.A. § 392*l*.

Sections 42 and 43 of the Enabling Act do provide some guidelines as to how SRM's investments must be undertaken. Nevertheless, although these rules and procedures place some outer limits with respect to investments, such guidelines grant SRM discretion to choose from a wide and ample gamut of investments, including various types of fixed income securities, money market instruments, stock, real property, risk capital, and financial instruments. *See* 18 L.P.R.A. § 392g and § 392h. Therefore, although SRM is technically cor-

rect that it is limited by the Enabling Act in its investment decisions, such limits are far from setting tight constraints, leaving much room for discretion within SRM for purposes of its decision-making regarding investments. Thus, the factor of whether SRM is capable of entering into contracts into its own name (and of making loans and investment decisions in its own name) also militates against the recognition of sovereign immunity for SRM.

## 6. Whether SRM's property is subject to state taxation.

SRM's Executive Director has submitted a statement under penalty of perjury indicating that SRM's property and/or investments are not subject to state or federal taxation. Docket 55, Exhibit 1 at ¶ 11. Plaintiff, however, argues that SRM's tax exemption applies only to the amount corresponding to the individual quotas of each teacher. Docket 61 at p. 8.

The individual quotas of each teacher enjoy tax exemption status. The Enabling Act provides as follows:

> The Teacher's Retirement System shall maintain an individual account for each teacher or ... [SRM] employee so as to credit them with the total amount of all fees contributed to the Fund as to the date of effectiveness of this act, as well as the future fees contributed, according to the provisions of this chapter. **Said fees shall be the exclusive property of the teacher or ... [SRM] employee and shall not be subject to any type of tax nor to embargo or transfer**. . . . 18 L.P.R.A. § 391n (emphasis added).

Certain portions of the Enabling Act, however, provide support to the view

espoused by SRM's Executive Director. For example:

> The Board of Trustees may authorize the Executive Director to borrow from any financial institution of the Government of the Commonwealth of Puerto Rico or the federal government of the United States, or through direct debt placements, securing said debt by the assets of . . . [SRM]. **The interest said obligations accrue shall be exempted from the payment of income taxes to the Commonwealth of Puerto Rico.** 18 L.P.R.A. § 392h(7) (emphasis added).

> Any documents on contracts or secure mortgage loans, mortgage renewals and cancellations, as well as the registration, annotation or any transaction related to said document which is part of . . . [SRM] and is executed before a notary, shall be declared **exempted from the payment of any type of fees and taxes.** 18 L.P.R.A. § 392i(d)

Therefore, plaintiff's position that SRM's tax exemption applies only to the amount corresponding to the individual quotas of each teacher is, at a minimum, inaccurate. On the other hand, the Enabling Act allows SRM to invest in "[b]onds, notes or titles of debts, **be they exempted or taxable securities . . . .**" 18 L.P.R.A. § 392h(1)(b) (emphasis supplied). Thus, it is not entirely correct either that all SRM's property and/or investments are not subject to state or federal taxation, as SRM's Executive Director contends. Nevertheless, SRM does seem to enjoy certain tax exemptions, a fact which should be considered in favor of its sovereign immunity request.

**7. Whether SRM has immunized itself from responsibility for the agency's acts or omissions.**

Plaintiff alleges that the Commonwealth has immunized itself from any possible judgment entered against SRM. Docket 47 at p. 6–7. In support of its argument, plaintiff cites Section 61 of the Enabling Act which provides that

> [a]ll debts, obligations, and responsibilities, including the active pensions of the teachers and their beneficiaries, as well as the obligation to fulfill and the right to receive the benefits of any judgment that may be pronounced against or in favor the Teacher's Retirement Board after the approval of this Act, are hereby transferred to the [SRM].

18 L.P.R.A. § 391(nt). This section, however, does not establish that the Commonwealth is immunized from any debts, obligations, and responsibilities of SRM. It merely provides for the transfer of any obligations from the Teacher's Retirement Fund to the newly created SRM. In other words, if SRM's predecessor had any judgments against it, the same became SRM's responsibility, not the Commonwealth's. But Section 61 does not say anything about judgments entered against SRM (as opposed to its predecessor).

Section 61 also does not establish that the Commonwealth's treasury must respond for any of SRM's debts, obligations, and responsibilities either. The Enabling Act is silent as to this issue; that is, it neither explicitly immunizes the Commonwealth from judgments entered against SRM nor makes the Commonwealth responsible for those judgments. It simply shields the Commonwealth's funds from judgments entered against SRM's predecessor. The fact that the Commonwealth has protected its coffers from any judgments rendered against SRM's predecessor does not automatically mean that the Commonwealth has immunized itself from any judgments against SRM. Notwithstanding the Enabling Act's si-

lence as to judgments against SRM, however, the Court notes that there is no indication in the Enabling Act to suggest that the Legislature of Puerto Rico wished to treat SRM differently from its predecessor in this respect.

In conclusion, an overview of the structural factors indicates that the same point in different directions as to the issue of whether SRM was structurally created to share the Commonwealth's sovereign immunity, but the balance leans more towards not providing Eleventh Amendment protection to SRM. Favoring plaintiff's position that SRM is not protected by sovereign immunity are the following structural factors: (1) SRM was created under the laws of the Commonwealth as an independent and separate entity from others of the Government of the Commonwealth; (2) SRM has the power to sue and be sued and to enter contracts in its own right; and (3) SRM has been granted substantial discretion in deciding, within the outer limits imposed by the Enabling Act, on how to invest or manage the pension funds and other revenues that it has generated independently. In addition, even though Section 61 is silent as to the issue of whether any judgments entered against SRM constitute SRM's sole responsibility, there is no indication in the Enabling Act that the Legislature of Puerto Rico wanted to protect the Commonwealth's treasury only from judgments against SRM's predecessor and not against SRM itself.

Other structural factors, however, support SRM's allegation that it is indeed an arm of the state enjoying sovereign immunity. For example, SRM does not have a commercial purpose. Furthermore, SRM enjoys certain tax exemptions that are more consonant with entities that are arms of the state. In addition, the power of the governor to designate or appoint members of SRM's Board of Trustees, although insufficient in itself, is a factor that also points towards state control. Nevertheless, taking into account all the relevant structural factors, the Court finds that SRM was created with a degree of independence inconsistent with those entities that share the Commonwealth's sovereign immunity.

Having recognized that the structural factors favor plaintiff's position more than defendant's, but also that said factors point in different directions as to the issue of whether SRM is clearly structured to share the sovereignty of the Commonwealth, we proceed to the second prong of the analysis, namely the exposure of the coffers of the Commonwealth to judgments entered against SRM.

**B. Whether the Commonwealth of Puerto Rico has legally or practically obligated itself to pay SRM's indebtedness**

 "[F]ederal courts are not free to assume that a state will voluntarily assume payment of the entity's debts if the entity is in need." *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.,* 322 F.3d 56, 65 n. 8 (1st Cir.2003). As discussed above, the Commonwealth is not legally bound to pay for SRM's indebtedness. Section 61 of the Enabling Act is silent on the issue. It neither immunizes nor makes responsible the Commonwealth for SRM's acts or omissions.[17] Furthermore, although the statute provides that "[i]n order to maintain the economic solvency of ... [SRM] ... and so as to provide adequate retirement benefits for the teachers and employees of ... [SRM], the Government of the Commonwealth of Puerto Rico shall contribute" a regular

---

**17.** Moreover, the Puerto Rico Supreme Court cases cited by plaintiff do not explicitly state that the Commonwealth will stand behind SRM's debt. *See* footnote 11.

appropriation equal to 8.5% of the total amount of the annual salaries of all of SRM's teachers employed by the Commonwealth, the statute does not require the Commonwealth to do anything else (e.g., satisfy judgments) in order to maintain SRM's economic solvency. 18 L.P.R.A. § 392l.

The question, then, boils down to whether the Commonwealth has practically obligated itself to pay SRM's indebtedness. "If the state substantially funds the entity, those funds would be a probable source to satisfy any judgment against the entity. On the contrary, if the entity has taxing powers and can issue bonds, state funds might not be at risk in litigation against the entity." (Moore's Federal Practice § 123.23[4][b], at 123–57 to 123–58 3d ed.2000). In analyzing this inquiry, the Court must look whether SRM has other sources of revenue and "whether the agency is so structured that, as a practical matter, the state anticipated budget shortfalls that would render the entity constantly dependent on the state." *Fresenius Medical Care Cardiovascular Resources, Inc. v. Puerto Rico and the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 65 n. 8 (1st Cir.2003) (citing *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 44–46, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)).

Once again, the record is mixed. On the one hand, SRM has the capacity to issue bonds; on the other hand, at least at first glance, it seems that the contributions of the Commonwealth to SRM are not a trivial amount. According to SRM's Executive Director, 56% of the contributions made to SRM's Fund during 2004 came directly from appropriations made by the Legislature from the General Expense Budget of the Commonwealth. During the hearing held on May 16, 2007, counsel for SRM indicated that that percentage has remained approximately the same during the years 2005 and 2006.

Once again the Court refers to the Executive Summary of Transition Report of the Teachers' Retirement System that appears in the website cited by plaintiff. *See* *www.srm.gobierno.pr.* For the year 2004, revenues are subdivided in three sections: contributions ("aportaciones"), interest ("ingresos por intereses"), and other income. If only the first section is taken into account ("aportaciones"), then SRM's Executive Director is correct in his 56% figure because of the $273,020,000 in contributions received by SRM, $113,000,000 constitute the government's matching contribution to the teachers' pension fund while $40,000,000 are appropriations made by the central government ("peticiones a OGP"). Therefore, during the year 2004 SRM received a total of $153,000,000 from the Commonwealth out of the $273,020,000 in the first category of contributions, yielding an approximate figure of 56%. However, if SRM's other revenues are taken into account, then the percentage changes. The revenues received by SRM in the year 2004 total $351,470,000, of which $77,450,000 came not from the Commonwealth, but rather from interest income related to personal loans, cultural loans, mortgage loans, leases, investments, and dividends. In addition, $120,000,000 came not from the Commonwealth, but from withholdings to teachers' salaries. In light of SRM's other sources of revenues during the year 2004, the $153,000,000 received from the Commonwealth constitute approximately 43.5% of the total revenues received by SRM, that is, $351,470,000. Therefore, by using the figure of 56%, SRM is overstating the degree of funding provided by the Commonwealth to said entity.

Furthermore, the bulk of the Commonwealth's funding consists primarily of the

matching contribution that the Commonwealth must provide to the fund under the law, that is 8.5% in return for the teachers' 9% deduction from their salaries. In other words, out of the $153,000,000 in contributions received by SRM in 2004, $113,000,000 (or 73.8%) relate to the matching contribution that the Commonwealth provides to those teachers who have elected to participate in system. This matching contribution is not discretionary. 18 L.P.R.A. § 392m. Unless the statute is amended, the Legislature of Puerto Rico cannot in one particular year choose arbitrarily to deny the 8.5% appropriation to the teachers' pension fund.

Once the 8.5% contribution is excluded from the analysis, it becomes evident that the Commonwealth's discretionary funding to SRM does not reach the level that SRM seeks to portray. In the year 2004, only 11.4% ($40,000,000 out of $351,470,000) represents the contribution that the Commonwealth made on a discretionary basis (*i.e.*, aside from the matching contribution that it must provide) to SRM's sources of revenue.

Although without question there is some degree of dependence of SRM on the Commonwealth's appropriation that is not insignificant, these numbers do not suggest that the Legislature of Puerto Rico created an entity with the intent of making it permanently dependent of the Commonwealth's treasury or with a degree of dependency that would certainly make the Commonwealth's coffers vulnerable to a judgment entered against said entity. SRM could satisfy a particular judgment from revenues that were not received through state appropriations and at this juncture, it cannot be said that it is more likely than not that state appropriations will bear the burden of any judgments against SRM. Furthermore, even if the Commonwealth considers itself obligated to keep SRM's pension fund economically

sound or to cover, for instance, SRM's payroll, that does not necessarily mean that the Commonwealth feels the same way about satisfying a particular judgment entered against SRM. The fact that SRM has a reserve precisely to deal with potential litigation or adverse judgments signals that the possibility that the Commonwealth's treasury may not be affected at all under those circumstances is not mere speculation.

WHEREFORE, taking into account SRM's structural factors and the potential risk to the funds of the Commonwealth of Puerto Rico, it is recommended that the Motion for Reconsideration (Dockets 53 and 55) be DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986).

July 17, 2007.